

WILENTZ, GOLDMAN & SPITZER, P.A.
90 Woodbridge Center Drive
P.O. Box 10
Woodbridge, NJ 07095
732-636-8000
Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------X

WILLIAM LEE and SZUYU PAN,            :

        Plaintiffs,            :

                    :

v.            :

                    :

BORDEN EAST RIVER REALTY LLC,            :

                    :

        Defendant.            :

---------------------------------------------------------X

**09 1721**

COMPLAINT

TOWNES, J.

      Plaintiffs, William Lee and Szuyu Pan ("Plaintiffs" or "Purchasers"), by their attorneys,

Wilentz, Goldman & Spitzer P.A., for their Complaint against Defendant, Borden East River

Realty LLC ("Defendant" or "Developer"), alleges as follows:

<u>**SUMMARY OF THE COMPLAINT**</u>

      1.    This is a civil action pursuant to the Interstate Land Sales Full Disclosure Act, as

amended, 15 U.S.C. §1701 <u>et seq.</u>, ("ILSFDA" or "The Act"), including without limitation

under the provisions of 15 U.S.C. §§ 1703, 1709 and 1719 of The Act and the regulations

promulgated thereto, 24 C.F.R. 1710.1, <u>et seq.</u> (1991) ("Regulations"),[1] to rescind an agreement

---

[1] The Federal Interstate Land Sales Full Disclosure Act, enacted by Congress in 1968, was designed to promote full and fair disclosures by sellers of real property. 15 U.S.C. § 1701, <u>et seq.</u>  As such, The Act imposes certain duties on developers who utilize the mails and interstate commerce, and creates claims against those who breach such duties. 15 U.S.C. § 1709.  The implementing Regulations set forth certain requirements as to the required format and contents of the Statement of Record.

to purchase a condominium unit at 5-49 Borden Avenue, Long Island City, New York, within the condominium property known as One Hunters Point Condominium (the "Condominium")[2], and to recover the purchase deposit tendered to Defendant.

2.     On January 3, 2008, Plaintiffs entered into a Purchase Agreement (the "Purchase Agreement") with Defendant to purchase Unit Number D6 within the Condominium (the "Unit") for $672,380.00. Pursuant to the Purchase Agreement, Plaintiffs paid Defendant a deposit of $67,238.00, which is ten (10%) percent of the purchase price of the Unit (the "Deposit").

3.     The Plaintiffs have a right to rescind the Purchase Agreement under 15 U.S.C. §§ 1703(a)-(d), and a right of action to pursue rescission rights under 15 U.S.C. § 1709, because the Defendant has not complied with the requirements of the ILSFDA by failing to:

(a)     furnish a printed property report (the "HUD Property Report") to the Plaintiffs pursuant to the requirements of §§ 1703(a)(1)B), 1703(c) and 1707 of The Act;

(b)     file with the Secretary of Housing and Urban Development (the "Secretary") and have in effect the statement of record (the "Statement of Record") required by §§ 1703(a)(1)(A), 1704, 1705 and 1706 of The Act;

(c)     provide required disclosures regarding rescission in the Plaintiffs' Purchase Agreement required by 15 U.S.C. §§ 1703(b) and 1703(c); and

(d)     deliver a deed to the Plaintiffs within 180 days from the date the Plaintiffs first signed the Purchase Agreement, as required under § 1703(d) of the Act because the Unit's legal description set forth in the Purchase Agreement was not in the form mandated by the provisions of The Act, which require that the Unit description must be in a form acceptable for recording by the public official responsible for maintaining land records in the jurisdiction where the unit is located, thereby entitling the Plaintiffs to an immediate right of rescission under 15 U.S.C. § 1703(d).

---

[2] Condominium or unit properties are "lots" within meaning of The Act. Schatz v. Jockey Club Phase III, Ltd., 604 F. Supp. 537 (S.D. Fla. 1985).

4.    On April 8, 2009, Plaintiffs notified the Defendant in writing that they elected to exercise their right to terminate the Purchase Agreement, pursuant to rescission rights afforded by The Act.

5.    The Defendant failed to respond in any way to Plaintiffs' election to exercise their right to terminate the Purchase Agreement.

6.    The Plaintiffs seek rescission of the Purchase Agreement and the return of the Deposit, as well as the recovery of their costs, attorney's fees, and other relief as more fully set forth herein.

## THE PARTIES

7.    Plaintiffs, William Lee and Szuyu Pan have an address at 474 48th Avenue, Apt. 7D, Long Island City, NY 11109.

8.    Upon information and belief, Defendant, Borden East River Realty LLC, has an office c/o Simone Development Company LLC, 1000 Main Street, New Rochelle, New York, 10801. The Defendant may be served with process by serving its registered agent or someone authorized to accept service at the same address.

## SUBJECT MATTER JURISDICTION

9.    Plaintiffs' cause of action arises under federal law, specifically, the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701 et seq.  This Court has subject matter jurisdiction pursuant to 15 U.S.C. §1719 to rescind a sale and purchase agreement for real property located within this district.

10.    15 U.S.C. § 1719 provides in pertinent part:

    The district courts of the United States, the United States court of any territory, and the United States District Court for the District of Columbia

#3161818 (152843.001)

shall have jurisdiction of offenses and violations under this chapter and under the rules and regulations prescribed by the Secretary pursuant thereto, and concurrent with State courts, of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter.  Any such suit or action may be brought to enforce any liability or duty in the district wherein the defendant is found or is an inhabitant or transacts business, or in the district where the offer or sale took place, if the defendant participated therein, and the process in such cases may be served in any other district of which the defendant is an inhabitant or where the defendant may be found.

## PERSONAL JURISDICTION

11.    Personal jurisdiction over Defendant is proper under §§ 301 and 302 of the State of New York's Civil Practice Law & Rules, Rule 4 of the Federal Rules of Civil Procedure and under the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States of America.

## VENUE

12.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and (c), as, upon information and belief, (1) Defendant transacts substantial and continuous business within this district; (2) Defendant offered the contract at issue in this case within this district; (3) the parties executed the contract at issue in this case within this district; (4) the real property at issue in this case is located within this district and (5) the claims alleged in this complaint accrued within this district.

## STATEMENT OF FACTS

13.    The Defendant is the developer of the Condominium located at 5-49 Borden Avenue, Long Island City, New York.

14.    The Defendant, in its campaign to sell the Unit in the Condominium to the Purchasers has employed several instrumentalities of interstate commerce, including the United

States Postal Service, electronic means of data and voice communication and non-governmental courier services.  Moreover, in its construction of the Condominium, the Developer has purchased goods and services which originated outside the State of New York and were transported to, and incorporated into, the Condominium, which is located in this district.

15.  The Condominium is believed to contain one hundred thirty two (132) residential units which were offered for sale by the Defendant as part of a "common promotional plan," as defined under § 1701(4) of The Act.

16.  On January 3, 2008, Plaintiffs and Defendant signed the Purchase Agreement, a copy of which is attached hereto as **Exhibit "A"** and the contents of which are incorporated by reference herein, to purchase Unit Number D6 at the Condominium (the "Unit") for $672,380.00.  Pursuant to the Purchase Agreement, Plaintiffs paid the Defendant a deposit of $67,238.00, which is ten (10%) percent of the purchase price of the Unit (the "Deposit").

17.  In connection with its offering and sale of condominium units within the Condominium, the Defendant failed to submit and properly register a Statement of Record with the Secretary of Housing and Urban Development for the Condominium as required under §§ 1703(a)(1)(A), 1704, 1705 and 1706 of The Act.

18.  In connection with its offering and sale of the Unit to Plaintiffs, the Defendant failed to provide Plaintiffs with an approved form of a printed HUD Property Report as required under §§ 1703(a)(1)(B), 1703(c), and 1707 of The Act.

19.   In connection with its offering and sale of the Unit the Defendant did not furnish the Plaintiffs with the required rescission notices within the Plaintiffs' Purchase Agreement required under §§ 1703(b) and 1703(c) of The Act.

20.   In connection with its offering and sale of the Unit to the Plaintiffs, the Defendant violated § 1703(d) by failing to provide in the Purchase Agreement, as required by The Act, 1) the legal description of the Unit in a form acceptable for recording by the appropriate public official responsible for maintaining land records in the jurisdiction where the Unit is located;[3] 2) certain notices regarding a purchaser's right to cure in the event of default;[4] and 3) certain limitations on damages in the event of the Purchasers' default as required by the Act.[5]

21.   The Defendant failed to qualify for the exemption to § 1703(d), which sets forth that the requirements set forth in§ 1703(d)(1)-(3) do not apply "to the sale of a unit, for which, within one hundred and eighty days after the signing of the sales contract, the purchaser receives a warranty deed,"[6] as Plaintiffs did not receive a warranty deed within one hundred and eighty days of signing the Purchase Agreement.

22.   Furthermore, in the offering and sale of condominium units in the Condominium, the Defendant did not comply with additional sections of The Act and participated in activities proscribed by § 1703.

23.   Based on the breach by Defendant of §§ 1703(a)-(d) of The Act, and the right of action afforded under § 1709 of the Act, the Plaintiffs have an unequivocal right under the Act

---

[3] 15 U.S.C. § 1703(d)(1)

[4] 15 U.S.C. § 1703(d)(2)

[5] 15 U.S.C. § 1703(d)(3)

[6] 15 U.S.C. § 1703(d)

to rescind the Purchase Agreement and receive a full refund of all monies paid to the Defendant, plus interest, costs, attorney's fees and other costs associated with the purchase of the condominium unit.[7]

24.    On April 8, 2009, Plaintiffs notified the Defendant in writing that they elected to exercise their statutory right to terminate the Purchase Agreement.

25.    The Defendant, in violation of the express requirements of The Act, has failed to acknowledge the Plaintiffs' election to exercise their right to terminate the Purchase Agreement, pursuant to rescission rights afforded by The Act.

## FIRST CAUSE OF ACTION

### (Violation of the Interstate Land Sales Full Disclosure Act - 15 U.S.C. §1701 et. seq.)

26.    Plaintiffs hereby incorporate, adopt and reallege by reference, as if set forth specifically herein, each and every allegation set forth in the foregoing Paragraphs of this Complaint.

27.    The Act, which is a strict liability statute, requires certain registration, disclosure and contractual requirements, prohibits fraudulent and misleading sales practices, and mandates certain sales practices to inform and protect consumers.  Specifically, The Act makes it unlawful for any developer, or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or the mails[8] with respect to the sale or lease of any lot in a subdivision not exempt under 15 U.S.C. § 1702 without properly registering a Statement of Record with the Secretary through the Office of

---

[7] See 15 U.S.C § 1709(a)-(c).

[8] 15 U.S.C. § 1701(8).

Interstate Land Sale Registration ("OILSR"), Department of Housing and Urban Development ("HUD").[9]

28.    Defendant, directly or indirectly, did develop, market, advertise, offer for sale, and participate in the offering for sale and/or contract for the sale of more than ninety nine (99) units in the subject Condominium by means or instruments of transportation or communications in interstate commerce, or the mails, in contravention of 15 U.S.C. §§ 1703(a)(1)(B), 1704, 1705 and 1706.[10]   Further, the Condominium is not exempt under 15 U.S.C. § 1702.[11]

29.    Unless a Statement of Record with respect to the subject Condominium is in effect in accordance with 15 U.S.C. §§ 1704, 1705 and 1706 and unless a complete and accurate printed HUD Property Report, meeting the requirements of 15 U.S.C. § 1707 (which includes a review and approval process by HUD which must issue an "Effective Date" as provided under the implementing Regulations for a disclosure document to be a valid HUD Property Report)[12] has been furnished to the purchaser in advance of the signing of the subject Purchase Agreement, Plaintiffs may revoke their contract within two years of the date of Plaintiffs' signing of the Purchase Agreement pursuant to § 1703(a)-(c) of The Act.

30.    The Defendant failed to file any type of Statement of Record with HUD.   The Defendant also failed to furnish the Plaintiffs with a printed Property Report meeting the

---

[9] See 15 U.S.C. §§ 1703(a)(1)(A), 1704, 1705 and 1706.

[10] The Act's registration and disclosure requirements do not apply to the sale of lots in a subdivision containing fewer than 100 lots. 15 U.S.C. § 1702(b)(1).

[11] See discussion, infra, ¶¶ 39-55.

[12] 24 C.F.R. § 1710.22(a)

requirements of The Act and the Regulations before the Plaintiffs signed the Purchase Agreement.

31.   As a result of the Defendant's failure to register a Statement of Record with the Secretary and failure to provide the Plaintiffs with a Property Report in advance of the Plaintiffs signing their Purchase Agreement, the Defendant has violated §§ 1703(a)(1)(A)-(B), 1703(c), 1704, 1705 and 1707 of The Act.

32.   Defendant also failed to comply with The Act by failing to include certain statutory provisions regarding the Plaintiffs' right of rescission in the Purchase Agreement. Section 1703(b) of The Act states that any contract or agreement for the sale of a lot not exempt under section 1702 may be revoked at the option of the purchaser until midnight of the seventh day following the signing of such contract or agreement, **"and such contract or agreement shall clearly provide this right."**[13] [emphasis added].

33.   The Purchase Agreement did not contain any language regarding the Plaintiffs' seven day right of rescission, and thereby, the Defendant has violated § 1703(b) of The Act. The Plaintiffs are entitled to exercise their statutory right of rescission under this section.

34.   § 1703(c) of The Act requires that "in the case of any contract or agreement for the sale or lease of a lot for which a property report is required by this chapter and the property report has not been given to the purchaser or lessee in advance of his or her signing such contract or agreement, such contract or agreement may be revoked as the option of the purchaser or lessee within two years from the date of such signing, and such contract or agreement shall clearly provide this right."

---

[13] 15 U.S.C. § 1703(b)

35.   The Defendant failed to furnish a HUD Property Report to the Plaintiffs, and therefore, the Plaintiffs are entitled to revoke the Purchase Agreement within two years of the signing of the Purchase Agreement.   Further, the Defendant failed to provide in the Purchase Agreement notice of the two year right of rescission for failure to furnish a HUD Property Report.   Pursuant to § 1709(b) of The Act, the Plaintiffs have a right of action to enforce their two year right of rescission.

36.   The Defendant has violated § 1703(d) of The Act by failing to include in the Purchase Agreement certain provisions required by The Act. The Act requires that any contract or agreement for the sale or lease of a condominium not exempt under §1702 of The Act may be revoked at the option of the purchaser or lessee for two years from the date of the signing of such contract or agreement if the contract or agreement does not provide:

   a.   A description of the unit which makes such unit clearly identifiable and which is in a form acceptable for recording by the appropriate public official responsible for maintaining land records in the jurisdiction in which the unit is located

   b.   That, in the event of a default or breach of the contract or agreement by the purchaser or lessee, the seller or lessor (or successor thereof) will provide the purchaser or lessee with written notice of such default or breach and of the opportunity, which shall be given such purchaser or lessee, to remedy such default or breach within twenty days after the date or the receipt of such notice; and

   c.   That, if the purchaser or lessee loses rights and interest in the lot as a result of a default or breach of the contract which occurs after the purchaser or lessee has paid 15 per centum of the purchase price of the lot, excluding any interest owed under the contract or agreement, the seller or lessor (or successor thereof) shall refund to such purchaser or lessee any amount which remains after subtracting (A) 15 per centum of the purchase price of the unit, excluding any interest owed under the contract or agreement, or the amount of damages incurred by the seller or lessor (or successor thereof) as a result of such breach, whichever is greater, from (B) the amount paid by the purchaser or lessee with respect

to the purchase price of the unit, excluding any interest paid under the contract or agreement.[14]

37.    The legal description of the Unit set forth in the Plaintiffs' Purchase Agreement is not in a form acceptable for recording by the appropriate public official responsible for maintaining land records in the district in which the Unit is located. Further, the Purchase Agreement does not set forth the Plaintiffs' right to notice and ability to cure in the event of default, nor does it include the required limitation upon damages in the event of the Plaintiffs' default.

38.    The Act sets forth an exception to the above requirements, stating that they do not apply "to the sale of a unit, for which, within one hundred and eighty days after the signing of the sales contract, the purchaser receives a warranty deed."[15] The Plaintiffs did not receive a warranty deed within one hundred eighty (180) days of signing the Purchase Agreement, and the Defendant's omission of the three requirements from the Purchase Agreement constitutes a violation of § 1703(d) of The Act.

39.    Furthermore, the Defendant has not properly qualified for any of the exemptions from the Act provided for under 15 U.S.C. § 1702 and as a consequence, may not now avail itself to these exemptions.  Pursuant to § 1702(a), the following types of sales are exempt from the registration requirements of The Act:

1)      The sale of a lot in a subdivision containing less than twenty-five (25) lots[16];

---

[14] 15 U.S.C. § 1703(d)

[15] 15 U.S.C. § 1703(d)

[16] The Act does not apply to the sale of lots or units in a subdivision or condominium containing fewer than 25 lots or units (unless the method of disposition is designed for the purpose of evading The Act). 15 U.S.C. § 1702(a)(1).

2)   The sale of a lot with completed improvements on it,[17] or the sale of a lot with promise to complete said Unit within two (2) years of the date the Purchase Agreement was signed;[18]

3)   The sale of evidence of indebtedness secured by a mortgage;

4)   The sale of a security in a real estate investment trust;

5)   The sale or lease of cemetery lot(s);

6)   The sale or lease of a lot to any person who acquires such lots for the purpose of engaging in the business of constructing a building or for the purpose of resale or lease of such lots to persons engaged in such business;

7)   The sale of real estate by a governmental agency;

8)   A sale or lease of real estate which is zoned for, or restricted by covenant to, industrial or commercial use.

40.   As the facts set forth above show, the sale to the Plaintiffs does not qualify for any of the exemptions set forth in The Act, nor has the Defendant represented that the sale to the Plaintiffs falls under an exempt category.

41.   The Condominium contains 132 units, making the twenty five unit exemption unavailable.

---

[17] The Act does not cover sales of improved land on which an already completed residential building exists. See 15 U.S.C. § 1702(a)(2). In addition, HUD has long considered condominium units to be "lots" within the meaning of The Act. See Guidelines For Exemptions Available Under the Interstate Land Sales Full Disclosure Act, 61 Fed. Reg. 13,596, 13,601 (March 27, 1996). Moreover, courts dealing with this issue have consistently held that a "condominium unit" constitutes a "lot." See, e.g., Winter v. Hollingsworth Properties, Inc., 777 F.2d 1444, 1448 (11th Cir. 1985) (acknowledging HUD's definition of lot to include condominium); Schatz v. Jockey Club Phase III, Ltd., 604 F. Supp. 537, 540-1 (S.D.Fla. 1985).

[18] Improved Lot Exemption. (See 15 U.S.C. § 1702(a)(2)). The Purchase Agreement did not unconditionally obligate the Defendant to complete construction of the Plaintiff's Unit within two years, and as a consequence, Defendant is, without limitation, required to comply with the reporting requirements of The Act. See Samara Development Corp. v. Marlow, 556 So.2d 1097, 1010 (Fla. 1990), Marco Bay Associates v. Vandewall, 472 So.2d 472, 474 (Fla. 2nd D.C.A. 1985), Aboujaoude v. Poincianca Developer Co. II, 509 F.Supp.2d 1266, 1271 (S.D. Fla. 2007), Sun Kyung Ahn v. Merrifield Town Ctr. Ltd. P'ship, 584 F. Supp. 2d 848 , 852-862 (E.D. Va. 2008) and Schatz v. Jockey Club, Phase III, Ltd., 604 F.Supp. 537, 542 (SD Fla. 1985).

#3161818 (152843.001)

42. The Condominium is not complete, and the Purchase Agreement attached to this Complaint as Exhibit A does not contain any language obligating the Developer to complete the Plaintiffs' Unit within two years of executing the Purchase Agreement.

43. The sale to the Plaintiffs was not evidence of indebtedness secured by a mortgage, the sale of a security in a real estate investment trust, or the sale to a builder.

44. The cemetery lot exemption is inapplicable to the Condominium.

45. The Developer is not a governmental entity.

46. The Condominium is not restricted to industrial or commercial use.

47. In addition to the exemptions listed above, The Act also sets forth certain additional exemptions from the registration requirements of the Act. These exemptions, set forth in section 1702(b) of The Act, include:

1) The sale of lots when there are fewer than one hundred lots for sale which are not exempt under § 1702(a) of The Act;[19]

2) The sale of lots if, within a twelve month period, the Developer sells fewer than twelve lots, subject to certain restrictions;[20]

---

[19] 15 U.S.C. § 1702(b)(1) and 24 C.F.R. 1710.6

[20] 15 U.S.C. § 1702(b)(2) and 24 CFR 1710.7

3)     The sale of lots in a subdivision if each noncontiguous part of the subdivision contains not more than twenty lots;[21]

4)     The Single Family Residence Exemption, which pertains only to single family residences in fully improved residential lot communities where all facilities are completed and/or bonded;[22]

5)     The sale of a lot, in certain instances, if a mobile home is to be placed thereon as a residence;[23]

6)     The Intrastate Exemption, which allows exemptions for sales that are of intrastate nature and that fulfill other certain requirements including the lot must be free and clear of all liens and encumbrances, developers must provide on-the-lot inspections before signing the sales contract, numerous required contractual provisions dealing with utility completion dates and rescission periods, and the signing of an intrastate exemption statement by the purchaser that includes specific developer disclosures and good faith estimates on utility costs.[24]

48.     None of the above-listed exemptions are available to the Developer.

49.     The Condominium does not qualify for the 99 lot exemption because there are 132 units in the Condominium, all of which are part of a common promotional plan.

50.     Upon information and belief, the Developer has not met the requirements of the twelve lot exemption.

51.     The Developer cannot meet the twenty lot exemption for the Condominium because it contains 132 units in a single building under one common promotional plan.

52.     The Developer cannot qualify for the single family residence exemption, which requires, among several criteria, that the contract for sale require delivery of the deed within one hundred eighty days after the signing of the sales contract.   The Purchase Agreement

---

[21] 15 U.S.C. § 1702(b)(3) and 24 CFR 1710.8

[22] 15 U.S.C. § 1702(b)(5) and 24 CFR 1710.10

[23] 15 U.S.C. § 1702(b)(6) and 24 CFR 1710.11

[24] See 15 U.S.C. § 1702(b)(7) and 24 CFR 1710.12

contained no such requirement, nor was a deed delivered to the Plaintiffs within one hundred eighty days.

53.   The mobile home exemption is not applicable to a condominium.

54.   The sales of units in the Condominium do not qualify for the Intrastate Exemption[25] because the disclosures, contract provisions and other requirements set forth in § 1702(b)(7) of The Act, which are necessary to comply with this exemption, have not been met and therefore, eliminates the availability of this exemption.

55.   The Defendant failed to seek and attain any of the exemptions under The Act. Since the Defendant was not exempt from The Act, it was therefore required to properly register the Condominium with the Secretary and provide a Property Report to the Plaintiffs before the signing of the Purchase Agreement.  Since the Defendant failed to fulfill either of these requirements, it has violated The Act and the Plaintiffs are not obligated to complete the purchase of the subject Unit and are afforded a right of rescission as well as other remedies under The Act.

56.   Plaintiffs, by written notice, timely notified Defendant of their election and demand to rescind the Purchase Agreement.   Specifically on April 8, 2009, Plaintiffs transmitted, via UPS (a nationally recognized commercial overnight carrier) a letter to the Developer stating that Plaintiffs would not complete the purchase of the Unit because of the above referenced breaches; and putting Defendant on notice that Plaintiffs were invoking and demanding their rescission rights pursuant to 15 U.S.C. §§ 1703 and 1709.   Nevertheless,

---

[25] 15 U.S.C. § 1702(b)(7)

#3161818 (152843.001)

- 15 -

Defendant failed to respond and to date, has not honored Plaintiffs' notice of revocation and rescission.

57.    Plaintiffs are entitled to, without limitation, revocation and rescission of the Purchase Agreement, and damages, including, but not limited to, return of all Earnest Monies, attorney's fees and expenses for this action and cost incurred, and contribution from all who are liable in such manner and to such extent and to such further relief as provided under 15 U.S.C. § 1709.

## **PRAYER FOR RELIEF**

58.    Plaintiffs pray for judgment and declarations against the Defendant as follows:

(1)    Rescission of the Purchase Agreement and return of their deposit monies of $67,238.00, plus accrued interest thereon;

(2)    that Plaintiffs be awarded their compensatory damages;

(3)    that Plaintiffs be awarded reasonable attorney's fees[26];

(4)    that Plaintiffs recover their costs of litigation[27];

(5)    that Plaintiffs be awarded pre and post judgment interest,

---

[26] Plaintiffs are entitled to an award of reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1709(c).
[27] Id.

#3161818 (152843.001)

- 16 -

(6)     that Plaintiffs be awarded any other damages allowable by any applicable statute; and

(7)     that Plaintiffs recover such further relief to which they may be entitled.


                            WILENTZ, GOLDMAN & SPITZER, P.A.
                            Attorneys for Plaintiffs, William Lee and
                            Szuyu Pan


                            By: _____
                                   LAWRENCE C. WEINER, ESQ.

Dated:  April 27, 2009


#3161818 (152843.001)
                                    - 17 -



RESIDENTIAL UNIT NUMBER - D6
PARKING SPACE UNIT NUMBER - N/A
ROOF TERRACE UNIT NUMBER - N/A

ONE HUNTERS POINT CONDOMINIUM
5-49 BORDEN AVENUE
LONG ISLAND CITY, NEW YORK

(TO BE EXECUTED IN QUINTUPLICATE)

AGREEMENT, made as of **JAN  3, 2008** between Sponsor (defined below) and Purchaser (defined below).

## WITNESSETH:

1.      THE PLAN. Purchaser acknowledges having received and read a copy of the Offering Plan for ONE HUNTERS POINT CONDOMINIUM dated September 11, 2007 and all amendments thereto, if any filed with the Department of State of New York (hereinafter, collectively, referred to as the "Plan") at least three (3) business days prior to Purchaser's signing this Agreement. If Purchaser has not received and read the Plan and all amendments thereto at least three (3) business days prior to Purchaser's signing this Agreement, Purchaser shall have the right to rescind this Agreement by sending written notice of such rescission to Sponsor by certified or registered mail, return receipt requested, or by personal delivery, in either case within seven (7) days from the date Purchaser delivers an executed Purchase Agreement together with the required Deposit to the Selling Agent. The Plan is incorporated herein by reference and made a part hereof with the same force and effect as if set forth at length. In the event of any inconsistency between the provisions of this Agreement and the Plan, the provisions of the Plan will govern and be binding, except as to inconsistencies arising from changes to the Purchase Agreement negotiated between Sponsor and Purchaser. Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Declaration, By-Laws and Rules and Regulations contained therein) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor. Notwithstanding anything to the contrary contained in this Agreement, nothing in the Plan or this Agreement shall be deemed to create any privity of contract between the Purchaser and any person identified in the Plan or any documents filed in connection therewith as a principal of Sponsor or Selling Agent, nor shall the Purchaser have any rights as against any such principal by reason of the incorporation of the Plan in this Agreement.

2.      DEFINITIONS. Terms used herein which are also used in the Plan shall have the same meanings as they do in the Plan, unless the context requires otherwise.

2.1     "Sponsor" means Borden East River Realty LLC, having an office c/o Simone Development Company LLC, 1000 Main Street, New Rochelle, New York 10801. Sponsor's taxpayer identification number is         .

1

(b)     $605,142.00 constituting the balance of the Purchase Price, by wire transfer of immediately available federal funds or by good certified check of Purchaser or official bank check payable on the delivery of the deed as hereinafter provided.

The Residential Unit, Parking Space Unit and Roof Terrace Unit, if applicable, shall collectively be referred to as the "Unit".

4.2     Wires shall be of immediately available federal funds wired to an account designated by the Sponsor. All checks shall represent United States currency, be drawn on or issued by a United States Bank or trust company which is a member of the Federal Reserve System and shall be unendorsed. The Deposit shall be made payable to the direct order of "Ruskin Moscou Faltischek, P.C., Escrow Agent." The balance of the Purchase Price shall be by wire or made payable to the direct order of "Borden East River Realty LLC" (or such other party as Sponsor directs to Purchaser, in writing at least three (3) days prior to the date of closing of title). If any check is returned for insufficient funds or any other reason, such return shall be deemed to be a default by Purchaser under this Agreement and shall entitle Sponsor to exercise any of the remedies set forth in Article 14 hereof. Notwithstanding the foregoing, if the check representing the Deposit is returned for insufficient funds or any other reason, such return shall be deemed to be a non-curable default by Purchaser and the Agreement shall automatically be deemed cancelled. Upon the cancellation of this Agreement, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though this Agreement had never been made, and without any obligation to account to Purchaser for any of the proceeds of such sale.

5.     DEPOSIT TO BE HELD IN TRUST. All Deposits made pursuant to this Agreement are subject to the requirements of Sections 352-e(2)(b) and 352-h of the New York General Business Law and the Attorney General's regulations promulgated pursuant thereto. All monies received from Purchaser towards the Deposit shall be delivered to Ruskin Moscou Faltischek, P.C., as escrow agent ("Escrow Agent") and shall be held by Ruskin Moscou Faltischek, P.C. in a segregated Escrow Account at Madison National Bank located at 849 Whitman Road, Merrick, New York 11566 in accordance with the section of the Plan entitled "Escrow and Trust Fund Requirements". By signing this Agreement, Purchaser will not object and will be deemed to have agreed, without the need for a further written agreement, to the release of the Deposit to Sponsor in the event Sponsor and Purchaser close title under this Agreement. If Purchaser shall default on his obligations under this Agreement, then the Deposit, and all sums paid by Purchaser to Sponsor for special work requested by Purchaser, shall be released to Sponsor as liquidated damages, and thereafter, neither party shall have any further rights or obligations against or to each other. In the event Sponsor cannot convey title to the Unit to Purchaser by reason other than Purchasers default, the Deposit shall be returned to Purchaser, within thirty (30) business days of Sponsor's notification to Purchaser that it cannot convey title.

3

6.      CLOSING DATE AND PLACE.

        6.1     The closing of title shall be held at the offices of Ruskin Moscou Faltischek, P.C., 1425 RexCorp Plaza, East Tower, 15th Floor, Uniondale, New York 11556 (or such other place in the City and State of New York as Sponsor may designate to Purchaser) and on such date and hour as Sponsor may designate to Purchaser on not less than thirty (30) days' prior written notice. If Sponsor consents to close at any other location as an accommodation to Purchaser, Purchaser shall pay to Sponsor's attorneys at closing an extra fee as set forth in the Plan. Sponsor may, from time to time, adjourn the date and hour for closing on not less than five (5) business days' notice to Purchaser, which notice shall fix a new date, hour and place for the closing of title.

        6.2     The term "Closing Date", "Closing", "Closing Of Title" or words of similar import, whenever used herein, shall mean the date designated by Sponsor on which the deed to the Unit is delivered to Purchaser, or any adjourned date fixed by Sponsor pursuant to subsection 6.1 hereof.

7.      DELIVERY OF THE DEED AND UNIT POWER OF ATTORNEY.

        7.1     At the closing of title, Sponsor shall deliver to Purchaser a bargain and sale deed with covenant against grantor's acts conveying fee simple title to the Unit to Purchaser, subject only to the liens, encumbrances, and title conditions set forth on Schedule A annexed hereto and made a part hereof. The deed shall be prepared by Sponsor substantially in the form set forth in Part II of the Plan and shall be executed and acknowledged by Sponsor in form for recording. Purchaser shall pay all New York State and New York City real property transfer taxes, and Sponsor and Purchaser shall duly execute a New York City Real Property Transfer Tax return (NYC RPT), a New York State Combined Real Estate Transfer Tax Return (TP-584) and a Real Property Transfer Report (RP-5217 NYC) and any other forms then required by law, all of which shall be prepared by Sponsor.

        7.2     At the closing of title and simultaneously with the deliver of the deed conveying the Unit to Purchaser, Purchaser shall execute and acknowledge a power of attorney to the Condominium Board prepared by Sponsor substantially in the form set forth in Part II of the Plan.

        7.3     At the closing of title, Purchaser shall execute whatever other documents are reasonably necessary or customary in connection with the conveyance of a Condominium Unit, including but not limited to title affidavits, real property transfer tax forms, etc.

        7.4     The executed deed and power of attorney to the Condominium Board shall be delivered to the representative of the title company insuring Purchaser's title (or, if no such representative is present, then to Sponsor's attorney) for recording in the City Register's Office, which recording shall be at Purchaser's expense. After being recorded, (i) the deed shall be returned to Purchaser and (ii) the power of attorney shall be sent to the Condominium Board.

7.5    Purchaser's payment of the balance of the Purchase Price and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing. However, nothing herein contained shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of purchasers under Article 23-A of the General Business Law, the Plan, and Part 20 of the Regulations issued by the Department of Law.

8.    <u>STATUS OF TITLE</u>.

8.1    At the closing of title, Sponsor shall convey to Purchaser good and insurable title in fee simple to the Unit, free and clear of all liens and encumbrances other than those expressly agreed to by Purchaser or set forth in Schedule A annexed hereto and made a part hereof or as otherwise permitted pursuant to the Plan.  Any lien and encumbrance or condition to which title is not to be subject shall not be an objection to title if (a) the instrument required to remove it of record is delivered at or prior to the closing of title to the proper party or to Purchaser's title insurance company, together with the attendant recording or filing fee, if any, or (b) All New York Title Agency, Inc. (or such other title insurance company as Purchaser may utilize), is or would be willing, in a fee policy issued by it to the Purchaser, to insure Purchaser that it will not be collected out of the Unit if it is a lien, or will not be enforced against the Unit if it is not a lien at no additional cost or additional premium to Purchaser.

8.2    Sponsor shall be entitled to adjourn the closing to remove or correct any defect in title which is not set forth in Schedule A. However, if such defect existed at least ten (10) days prior to the closing and Purchaser, or Purchaser's attorney, failed to send Sponsor's attorney written notice of such defect in title at least ten (10) days prior to the closing of title, then, for purposes of Article 14 below, Purchaser shall be deemed at fault for not having sent timely notice, and the closing adjournment to allow Sponsor to correct or remove such title defect shall be considered as being at the request of Purchaser. Seller's receipt of the title report shall be deemed sufficient notice.

8.3    Purchaser's acceptance of the deed for the Unit shall be deemed to be a full performance and discharge of each and every agreement and obligation on the part of Sponsor to be performed pursuant to the provisions of this Agreement, the Plan, 13 NYCRR, Part 20 (the regulations of the Attorney General of the State of New York governing the acceptance for filing of the Plan) and General Business Law §352-e, and no obligations of the Sponsor shall survive delivery of the Unit Deed except as otherwise expressly provided in this Agreement or the Plan.  Except where the context otherwise requires, all the representations, warranties, and obligations of the Purchaser under this Agreement shall survive delivery of the deed and the closing of title hereunder, whether or not specifically so stated in any particular provision.

5

9.   <u>CLOSING ADJUSTMENTS.</u>

9.1   The following adjustments shall be made as of midnight of the day preceding the Closing Date with respect to the Unit:

(a)   real estate taxes and assessments, if any (including water charges and sewer rents, if separately assessed), on the basis of the period for which assessed:

(b)   Common Charges and assessments for the month in which title closes; and

(c)   if Purchaser is allowed to occupy the Unit prior to Closing, accrued rent and any other charges pursuant to an interim lease or use and occupancy agreement, if any, covering the Unit.

9.2   If a Unit has been separately assessed but the closing of title occurs before the tax rate is fixed, adjustment of taxes shall be based upon the latest tax rate applied to the most recent applicable assessed valuation. Installments for tax assessments due after the delivery of the deed, if any, shall be paid by Purchaser and shall not be considered a defect in title. If a Unit has not been separately assessed as of the Closing Date for the then current tax period, the adjustment under subsection 9.1(a) hereof shall be based upon the assessment for the Property and the percentage interest in the Common Elements appurtenant to the Unit.

9.3   Purchaser hereby agrees that, if Sponsor obtains a refund for real estate taxes paid (or a credit for such taxes to be paid) on Purchaser's Unit, Purchaser and Sponsor will apportion the refund (as well as the costs and/or fees for obtaining the refund or credit) based on the percentage of time for which the refund or credit is obtained during which each party hereto owned the Unit in question. The provisions of this subsection shall survive the closing of title.

9.4   Provided Sponsor is ready, willing and able to close title in accordance with this Agreement, if Purchaser fails for any reason to close title to his Unit within ten (10) days of the originally scheduled Closing Date (a) the closing apportionments described in Section 9. 1 of this Agreement will be made as of midnight of the day preceding the originally scheduled Closing Date, regardless of when the actual closing of title occurs, and (b) Purchaser will be required to pay to Sponsor, as a reimbursement of Sponsor's higher carrying costs for the Unit by virtue of the delay, and in addition to the other payments to be made to Sponsor under this Agreement and the Plan, an amount equal to 0.03% of the Purchase Price for each day starting from (and including) the originally scheduled Closing Date to (and including) the day before the actual Closing Date. If, through no fault of Purchaser, Sponsor postpones the originally scheduled Closing Date, these provisions shall apply to the rescheduled Closing Date if Purchaser fails for any reason to close title to his Unit within ten (10) days of the rescheduled Closing Date.

6

9.5     Adjustments and apportionments shall be calculated on the basis of the actual number of days in the period for which payments were made or are due, as the case may be. The "Customs in Respect of Title Closings" recommended by The Real Estate Board of New York. Inc., as amended to date, shall apply to the adjustments and other matters therein mentioned except as otherwise provided herein in the Plan.

9.6     Any errors or omissions calculating apportionments at closing shall be corrected and, any payment shall be made to the proper party promptly after discovery. This provision shall survive the closing of title for a period of one (1) year from the Closing Date.

10.    MORTGAGE TAX CREDIT. In the event a mortgage recording tax credit becomes available pursuant to Section 339-ee(2) of the New York Condominium Act, it is specifically understood that such credit shall inure to the benefit of Sponsor. Accordingly, at closing, a Purchaser who elects mortgage financing will be responsible to pay the full amount (but not in excess thereof) of the mortgage recording tax chargeable on the entire amount being financed.  At the closing of title, Sponsor will be reimbursed by Purchaser to the extent of any mortgage tax credit allowed.

11.    CLOSING COSTS. In addition to those costs and adjustments described in Articles 9 and 10 herein, Purchaser shall be required to pay the other closing costs which are Purchaser's responsibility as more particularly described in the Section of the Plan entitled "Closing Costs and Adjustments." All such Closing Costs shall be paid by Purchaser, at closing, by Purchaser's unendorsed personal certified check or by official bank check, in either event drawn upon a bank that is a member of the New York Clearing House Association.  For the purposes of computing the State Transfer Tax, the RPT Tax and the Mansion Tax, the purchase price shall include the purchase price of a Residential Unit, a Parking Space Unit and Roof Terrace Unit. Purchaser shall receive a credit of $7,500.00 towards closing costs from Sponsor.

12.    TRANSFER TAX RETURNS. At the closing, Purchaser and Sponsor shall duly complete and sign before a notary public the Real Property Transfer Report Form RP-5217NYC required to be filed with the City of New York ("Transfer Report"), the real property transfer tax return required to be filed with the City of New York ("RPT Form") and the Combined Real Estate Transfer Tax Return and Credit Line Mortgage Certificate ("Combined Tax Form") required to be filed with the Department of Taxation and Finance of the State of New York (the "Tax Department") or such other forms as may then be required by law. The Transfer Report, RPT and Combined Tax Form shall be delivered at the closing of title to the representative of Purchaser's title insurance company (or, if none, to Sponsor's attorney) for filing with the proper governmental officer.

13.    AGREEMENT SUBJECT TO MORTGAGE. No lien or encumbrance shall arise against the Property or the Unit as a result of this Agreement or any monies deposited hereunder, except as hereinafter set forth. In furtherance and not in limitation of the provisions of the preceding sentence, Purchaser agrees that the provisions of this Agreement are and shall be

7

subject and subordinate to the lien of any mortgage heretofore or hereafter made, including, but not limited to, any construction or building loan mortgage, and any advances heretofore or hereafter made thereon and any payments or expenses made or incurred or which hereafter may be made or incurred, pursuant to the terms thereof, or incidental thereto, or to protect the security thereof, to the full extent thereof, without the execution of any further legal documents by Purchaser. This subordination shall apply in all cases, regardless of the timing of, or cause for, the making of advances of money or the incurring of expenses. Sponsor shall, at its option, either satisfy such mortgages or obtain a release of the Unit and its undivided interest in the Common Elements from the lien of such mortgages on or prior to the Closing Date. The existence of any mortgage or mortgages encumbering the Property, or portions thereof other than the Unit and its undivided interest in the Common Elements, shall not constitute an objection to title or excuse Purchaser from completing payment of the Purchase Price or performing all of Purchaser's other obligations hereunder or be the basis of any claim against, or liability of, Sponsor, provided that any such mortgage(s) is subordinated to the Declaration.

14.    DEFAULT BY PURCHASER.

14.1    The following shall constitute "Events of Default" hereunder:

(i)    Purchaser's failure to pay the balance of the Purchase Price set forth in Section 4.1(b) hereof, or any closing apportionment or closing cost required to be paid by Purchaser in Article 9, 10 or 11 hereof on the Closing Date designated by Sponsor pursuant to Article 6 hereof, or the dishonor of any check given by Purchaser to Sponsor; or

(ii)    the failure to pay, perform or observe any of Purchaser's other obligations hereunder; or

(iii)    if Purchaser is permitted to become the tenant or other occupant of the Unit, Purchaser's failure to pay rent or to perform some other lease or occupancy obligation within the period after notice, if any, set forth in the lease or occupancy or other agreement; or

(iv)    Purchaser's assignment of any of Purchaser's property for the benefit of creditors, or Purchaser's filing a voluntary petition in bankruptcy; or

(v)    If a non-bankruptcy trustee or receiver is appointed over Purchaser or Purchaser's property, or an involuntary petition in bankruptcy is filed against Purchaser; or

(vi)    If a judgment or tax lien is filed against Purchaser and Purchaser does not pay or bond the judgment or tax lien; or

(vii)    If Purchaser has entered into other purchase agreements to

8

purchase other Units, and an Event of Default, as defined in such other purchase agreements has occurred.

14.2    TIME IS OF THE ESSENCE with respect to Purchaser's obligations to pay the balance of the Purchase Price and to pay, perform or observe Purchaser's other obligations under this Agreement. Upon the occurrence of an Event of Default, Sponsor, in its sole discretion, may elect by notice to Purchaser to cancel this Agreement. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of the notice of cancellation to cure the specified default. If the default is not cured within such thirty (30) days, then this Agreement shall be deemed cancelled, and Sponsor shall have the right to retain, as and for liquidated damages, the entire Deposit and any interest earned on the Deposit. In addition, Sponsor shall be entitled to (a) retain, as liquidated damages, any amount paid by Purchaser to Sponsor for special work requested by Purchaser and (b) recover, as liquidated damages, from Purchaser the costs and expenses Sponsor has incurred or will incur in reliance on Purchaser's request for special work. Sponsor shall not close title to a Roof Terrace Unit or Parking Space Unit unless Purchaser has previously purchased or simultaneously purchases a Residential Unit. Upon the cancellation of this Agreement, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan, and the Unit may be sold to another as though this Agreement had never been made, and without any obligation to account to Purchaser for any of the proceeds of such sale.

15.    AGREEMENT SUBJECT TO PLAN BEING EFFECTIVE. The performance by Sponsor of its obligations under this Agreement is contingent upon the Plan having been declared effective in accordance with the terms and provisions of the Plan (as the same may be amended from time to time). The Plan may be withdrawn or abandoned by Sponsor only under certain conditions and at certain times, as set forth in the Plan. If the Plan is abandoned or if after being declared effective, the Plan is not consummated for any reason and Purchaser is not in default under this Agreement beyond any applicable grace period, this Agreement shall be deemed cancelled and the Deposit, together with interest earned thereon, shall be returned to Purchaser. Upon such return, neither party shall have any further rights, obligations or liability to or against the other and the parties shall be released and discharged from all obligations and liability under this Agreement and the Plan.

16.    SPONSOR'S INABILITY TO CONVEY THE UNIT. If Sponsor is unable to deliver title to the Unit to Purchaser in accordance with the provisions of this Agreement and the Plan by reason of a defect in title, substantial damage or destruction of the building by fire or other casualty, or the taking of any material portion of the Property by condemnation or eminent domain, Sponsor shall not be obligated to bring any action or proceeding or otherwise incur any cost or expense of any nature whatsoever in excess of its obligations set forth in the Plan in order to cure such inability. If Sponsor is not so obligated under the Plan and notifies Purchaser of its election or inability to cure such title defect, Purchaser's sole remedy shall be to either (a) take title to the Unit subject to such title defect (without any abatement in, or credit against, the Purchase Price, or any claim or right of action against Sponsor for damages or otherwise) or (b) terminate this Agreement. If Purchaser so elects to terminate this Agreement, Sponsor shall,

9

within thirty (30) days after receipt of notice of termination from Purchaser, return to Purchaser all sums deposited by Purchaser hereunder, together with interest earned thereon, if any. Upon making such payment this Agreement shall be terminated and neither party hereto shall have any further rights, obligations or liability to or against the other under this Agreement or the Plan. The foregoing remedy must be exercised by notice to Purchaser in writing to Sponsor within fifteen (15) days after the giving of Sponsor's notice of election not to cure such inability, failing which it shall be conclusively deemed that Purchaser elected the remedy described in clause (a) above, *i.e.* to acquire title subject to such inability.

17.     FIXTURES, APPLIANCES AND PERSONAL PROPERTY. Only those fixtures, appliances and items of personal property which are described in the Plan as being included in the Unit are included in this sale. No portion of the Purchase Price shall be attributable to such items.

18.     CONSTRUCTION.

18.1     The construction of the Building and the Unit, including the materials, equipment and fixtures to be installed therein, shall be substantially in accordance with the Plan and the Plans and Specifications (as defined in the Plan), subject to the right of Sponsor to amend the Plan and the Plans and Specifications in order to substitute materials, equipment or fixtures of equal or better quality, provided that the approval of any governmental authorities having jurisdiction is first obtained (if required). The issuance of a final certificate of occupancy for the Building shall be deemed presumptive evidence that the Building and the Unit have been fully completed in accordance with the Plan and the Plans and Specifications.

18.2     Purchaser acknowledges and agrees that Sponsor will not be liable for, and will have no obligation to correct, certain variations from the Plan and Plans and Specifications as indicated in the Section of the Plan entitled "Rights and Obligations of Sponsor" and will only be responsible to correct any construction defects to the extent, and on the terms and conditions, set forth in such Section.

18.3     The closing of title shall occur only after, or concurrently with, compliance with the prerequisites set forth under "Closing of Title to Units" in Part I of the Plan. As a result, if all other prerequisites not involving the construction of the Unit are met, Purchaser shall be obligated to close and complete payment of the full Purchase Price (without provision for escrow) once a temporary or permanent certificate of occupancy is issued for the Unit (notwithstanding any construction items noted on Purchaser's Inspection Statement (as hereinafter defined) remaining for Sponsor to complete and/or correct in accordance with its obligation under the Plan, and notwithstanding the incomplete construction and/or decoration of any other portions of the Building not affecting the Unit).

18.4     The actual date for the First Closing is not guaranteed or warranted, and may be earlier or later depending on the progress of construction and compliance with the other prerequisites recited in the Section of the plan entitled "Closing of Title to Units". Purchaser

N:\Clients\One Hunters Point\red\FORM - Purchase Agreement - 1 Hunters Pointa.doc

acknowledges that construction may be delayed by late delivery of material or equipment, labor difficulties, unavailability of building trades, casualty, inclement weather and other events beyond Sponsor's reasonable control. Purchaser further acknowledges that the Units in the Building will be completed at varying times over a period that could extend well beyond the First Closing. The order in which these Units will be completed is in the discretion of Sponsor. Purchaser acknowledges that Purchaser shall not be excused from paying the full Purchase Price, without credit or set-off, and shall have no claim against Sponsor for damages or losses, but may be entitled to terminate this Agreement and obtain a full refund of the Deposit under limited circumstances as provided in the Plan, in the event that the First Closing occurs substantially later than the projected date or the time to complete or to close title to the Unit is delayed or is postponed by Sponsor.

19.   INSPECTION OF THE UNIT.

19.1   At least one week (but not more than one month) prior to the Closing Date, the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange appointment with a representative of Sponsor to inspect the Unit within the week prior to the Closing Date. Purchaser or his or her duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Statement (in the form set forth as Schedule B to this Agreement) and deliver same to the Sponsor's representative at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within the Prior to the Closing Date or to so sign and deliver the completed Inspection Statement shall not excuse Purchaser paying the balance of the Purchase Price when due and shall constitute Purchaser's full acceptance of the Unit. However, nothing herein shall relieve Sponsor of its obligations as set forth in the Section of the Plan entitled "Rights and Obligations of Sponsor".

30 days   Any work set forth on the Inspection Statement may be completed by Sponsor in a¹ period of time following the Closing and shall not be grounds for delaying the Closing. Purchaser will be required to provide Sponsor with reasonable access to the Unit subsequent to the Closing in order to complete punch list work. Sponsor has no obligation under the Plan to deposit any monies in escrow at Closing as a result of any punch list items.

20.   DAMAGE TO THE UNIT.

20.1   If between the date of this Agreement and the Closing of Title the Unit is damaged by fire or other casualty, unless the damage is caused by Purchaser or Purchaser's representatives (including, but not limited to, an architect, engineer, contractor, decorator or agent, or an employee of any of the foregoing) or unless damage occurs after Purchaser is given possession of the Unit under an interim lease or otherwise, the following provisions shall apply:

(a)   The risk of loss to the Unit by fire or other casualty until the earlier of closing of title or possession of the Unit by Purchaser is assumed by Sponsor; provided that Sponsor shall have no obligation or liability to repair or restore the

11

N:\Clients\One Hunters Point\red\FORM - Purchase Agreement - 1 Hunters Pointa.doc

Unit. If Sponsor elects to repair or restore the Unit, which election shall be made within sixty (60) days of such damage, this Agreement shall continue in full force and effect, Purchaser shall not have the right to reject title or receive a credit against, or abatement in, the Purchase Price and Sponsor shall be entitled to a reasonable period of time within which to complete the repair or restoration, not to exceed one hundred eighty (180) days from Sponsor's election to repair the Unit. Any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss shall, subject to the rights of the Condominium Board and other Unit Owners if the Declaration has theretofore been recorded, belong entirely to Sponsor and, if such proceeds are paid to Purchaser, Purchaser shall promptly upon receipt thereof turn them over to Sponsor. The provisions of the preceding sentence shall survive the Closing of Title.

(b)    In the event Sponsor notifies Purchaser that it does not elect to repair or restore the Unit, or, if the Declaration has been recorded prior thereto, the Unit Owners do not resolve to make such repairs or restoration pursuant to the By-laws, this Agreement shall be deemed cancelled and of no further force and effect and Sponsor shall return to Purchaser all sums deposited by Purchaser hereunder, together with interest earned thereon, if any, and neither party hereto shall have any further rights, obligations or liability to or against the other hereunder or under the Plan, except that if Purchaser is then in default hereunder (beyond any applicable grace period), Sponsor shall retain all sums deposited by Purchaser hereunder, together with any interest earned thereon, as and for liquidated damages.

20.2   If the damage or casualty occurs after Purchaser is given possession of the Unit under an interim lease or otherwise, or the damage or casualty is caused by Purchaser or a representative of Purchaser (including, but not limited to, an architect, engineer, contractor, decorator or agent, or an employee of any of the foregoing), Purchaser shall assume the risk of loss, to the extent the loss is not covered by insurance maintained by Sponsor or, if the First Closing of a Unit has occurred, the Condominium Board, and the following shall apply:

(a)    Purchaser shall be obligated: (1) to accept title to the Unit at Closing subject to such loss; and (2) to pay the full Purchase Price without abatement, set-off or credit and without recourse of any kind against Sponsor;

(b)    Purchaser shall not be entitled to postpone the Closing by reason of the damage or casualty and may not commence work to restore the loss until after title closes (unless Purchaser is in possession under an interim lease or otherwise); and

(c)    if Purchaser fails to comply with this Section 20.2, such failure shall constitute an Event of Default by Purchaser entitling Sponsor to cancel this

Agreement and receive and retain the Deposit and other amounts specified in Section 14.2 as liquidated damages.

Purchaser expressly waives the provisions of Section 227 of the Real Property Law of the State of New York and agrees that the provisions of this Article 20 shall govern and control in lieu thereof.

21.    NO REPRESENTATIONS. Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or otherwise, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners, the estimated Common Charges allocated to the Unit, the estimated real estate taxes on the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, the right to any income tax credit with respect to the purchase of the Unit or any other data, except as herein or in the Plan specifically represented. Purchaser has relied solely on his own judgment and investigation in deciding to enter into this Agreement and purchase the Unit. No person has been authorized to make any representations on behalf of Sponsor except as herein or in the Plan specifically set forth. No oral representations or statements shall be considered a part of this Agreement. Except as expressly set forth in the Plan, Sponsor does not make any representations as to the condition, income, expenses, use, operation or any other matter or thing affecting or relating to the Property or title thereto or the transactions contemplated hereby. Without limiting the generality of the foregoing, but except as may otherwise be specifically provided in the Plan, Sponsor has not made any representations or warranties, in either case express or implied as to (i) the description or physical condition of the Property or the Unit, or the size or the dimensions of the Unit, or any other physical characteristics thereof; (ii) the services to be provided to Unit Owners; (iii) the estimated Common Charges allocable to the Unit; (iv) the right to any income tax deduction for any real estate taxes or mortgage interest paid by the Purchaser; (v) the current or future real estate tax liability, assessment or valuation of the Property or the Unit; (vi) the potential qualification of the Property or the Unit for any and all benefits conferred by federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar of dissimilar to those enumerated; (vii) the compliance of the Unit or the Property, in its current or any future state with applicable zoning ordinances and the ability to obtain a variance in respect to any non-compliance, if any, with said zoning ordinances; (viii) the availability of any financing for the purchase, alteration, rehabilitation or operation of the Unit or the Property from any source, including but not limited to the state, city or federal government or any institutional lender; (ix) the current or future use of the Unit or the Property; (x) the current or future condition and operating state of any and all machinery or equipment in the Unit or on the Property and the current or future structural and physical condition of the Unit, the Building or any other improvements to the Property or their suitability for rehabilitation or renovation; (xi) the state of title to the Unit; (xii) the presence or absence of violations of law or municipal ordinances, orders or requirements; or (xiii) the ability of any Unit

Owner to exercise, enjoy or enforce any rights or benefits granted to any Unit Owner under either the Declaration or the By-Laws, the compliance thereof with applicable law or the sufficiency thereof for any Unit Owner's intended use. Except as specifically provided otherwise in the Plan, Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof or of the Common Elements, as shown on the Floor Plans is accurate or correct, and (b) that Purchaser shall not be relieved of any Purchaser's obligations hereunder by reason of any immaterial or insubstantial inaccuracy or error. The provisions of this Article 21 shall survive the closing of title.

22.  **PROHIBITION AGAINST ADVERTISING.** Prior to the closing of title, Purchaser agrees not to list the Unit for resale or rental with any broker or to advertise or otherwise offer, promote or publicize the availability of the Unit for sale or lease, without Sponsor's prior written consent. Any listing of the Unit or form of advertising, promotion or publicizing of the Unit by Purchaser prior to Closing of title shall be a default by Purchaser, entitling Sponsor to the remedies set forth in Article 14 hereof.

23.  **BROKER.** Purchaser represents to Sponsor that Purchaser has not dealt with any broker in connection with this transaction other than the Selling Agent and the Co-Broker. Purchaser shall pay the commission of any broker with whom Purchaser may have dealt, other than the Selling Agent and the Co-Broker. Purchaser agrees that, should any claim be made against Sponsor for commissions by any broker, other than the Selling Agent, on account of any acts of Purchaser or Purchaser's representatives, Purchaser will indemnify and hold Sponsor free and harmless from and against any and all liabilities and expenses in connection therewith, including reasonable legal fees. The provisions of this Article shall survive the closing of title.

24.  **AGREEMENT MAY NOT BE ASSIGNED.**

24.1  Purchaser does not have the right to assign this Agreement without the prior written consent of Sponsor, which consent may be unreasonably withheld or delayed. Any purported assignment by Purchaser in violation of this Agreement will be voidable at the option of Sponsor. Sponsor's refusal to consent to an assignment will not entitle Purchaser to cancel this Agreement or give rise to any claim for damages against Sponsor. Under no circumstances will Sponsor consent (a) to an assignment of a Purchase Agreement with respect to a Residential Unit if such Purchase Agreement would not then be included in the percentage required to declare the Plan effective, or (b) to an assignment of the Purchase Agreement in which the Purchaser will receive consideration. If Sponsor, in its sole discretion, consents to a Purchaser's request for an assignment of this Agreement or for the addition, deletion or substitution of names on this Agreement, then Purchaser shall be required to pay Sponsor's attorneys a fee of $750, in advance, for preparation of an assignment and assumption agreement. Any purported assignment by Purchaser in violation of this Agreement shall be a default by Purchaser, entitling Sponsor to the remedies set forth in Article 14 hereof and shall be voidable at the option of Sponsor.

**14**

24.2    Notwithstanding anything to the contrary contained in Article 24, if Purchaser has signed this Agreement in an individual name (and not in the name of an entity). Purchaser shall have a one time right to assign Purchaser's rights under this Agreement, in whole, but not in part, to an entity "controlled" (as such term is defined below) by Purchaser, (the entity to which the rights are assignable may be a trust, limited liability company or a corporation) or to member(s) of Purchaser's immediate family, provided that (i) Purchaser designates such assignee at least five (5) business days prior to the Closing Date; (ii) Purchaser delivers to Sponsor's counsel a fee in the amount of $750 for its services required in connection with the preparation of the assignment and assumption agreement; (iii) the Closing will not be delayed as a result of such assignment, (iv) the assignee of this Agreement assumes in writing, by an instrument prepared by Sponsor's counsel of this Agreement assumes in writing the obligations of Purchaser under this Agreement and (v) the assignment is made without consideration.   As used in this subparagraph, the term "control" shall mean the control, either directly or indirectly, of at least 51% of the voting shares or equity interests of such assignee, together with the authority to direct and manage the affairs of such assignee, which shall include Purchaser, being the managing general partner of such partnership or the principal manager or managing member of such limited liability company. Any obligations of Purchaser may be performed by such assignee, and Sponsor agrees to accept such performance as if it were the performance of the Purchaser. No such assignment shall modify Purchaser's obligations hereunder, including without limitation, named Purchaser's indemnity obligations contained in this Agreement, or reduce or limit any liability or obligation of Purchaser, who shall remain primarily liable notwithstanding any liability assumed by assignee. Unless Purchaser complies with the provisions of this subparagraph, any purported assignment by Purchaser shall be null and void and of no effect as against Sponsor.

25.    BINDING EFFECT. The submission of this Agreement to Purchaser does not create a binding obligation on the part of Sponsor. This Agreement shall not be binding on Sponsor until a fully executed counterpart hereof has been delivered to Purchaser. If this Agreement is not accepted within thirty (30) days from the date hereof by the delivery to Purchaser of a fully executed counterpart this Agreement shall be deemed to have been rejected and cancelled and the deposit paid on the execution hereof shall be promptly returned to Purchaser. Upon such refund being made, neither party shall have any further rights, obligations liability to or against the other hereunder or under the Plan. Prior to Sponsor's countersigning and returning this Purchase Agreement to Purchaser, and at any time thereafter. Purchaser agrees upon request to provide Sponsor with written information about Purchaser's employment, financial and rental/ownership history. Such information obtained prior to countersignature may be used to determine Purchaser's qualification to purchase and own the Unit, but does not constitute a reservation or binding obligation on either the applicant or Sponsor. Sponsor has the right, without incurring any liability, to reject this Agreement without cause or explanation to Purchaser. This Agreement may not be rejected due to Purchaser's sex, race, creed, color, national origin, ancestry, disability, marital status, or other ground proscribed by law.

N:\Clients\One Hunters Point\red\FORM - Purchase Agreement - 1 Hunters Pointa.doc

26. <u>NOTICES.</u>

      26.1  Any notice, election, demand, request; letter, consent or other communication hereunder or under the Plan shall be in writing and either delivered in person or sent, postage prepaid, by registered or certified mail return receipt requested or by Federal Express or other reputable overnight courier, with receipt confirmed to Purchaser at the address given at the beginning of this Agreement with a copy to the Attorney for Purchaser and to Sponsor at the address given at the beginning of this Agreement, with a copy to the Attorney for Seller in the same manner as notice is given to Sponsor. Either party may hereafter designate to the other in writing a change in the address to which notices are to be sent. Except as otherwise expressly provided herein, a notice shall be deemed given when personal delivery or delivery by overnight courier is effected, or in the case of mailing, the three (3) days after the date of mailing, except that the date of actual receipt shall be deemed to be the date of the giving of any notice of change of address. Any notice either of the parties hereto receives from the other party's attorney's shall be deemed to be notice from such party itself

      26.2  Sponsor hereby designates and empowers both the Selling Agent and Sponsor's counsel Ruskin Moscou Faltischek, P.C. as Sponsor's agents to give any notice to Purchaser under this Agreement (including, without limitation, a notice of default) in Sponsor's name, which notice so given shall have the same force and effect as if given by Sponsor itself.

27. <u>JOINT PURCHASERS</u>. The term "Purchaser" shall be read as "Purchasers" if more than one person are Purchasers, in which case their obligations shall be joint and several.

28. <u>LIABILITY OF SPONSOR.</u>  Sponsor shall be excused from performing any obligation or undertaking provided for in this Agreement for so long as such performance is prevented, delayed or hindered by an act of God, fire, flood, explosion, war, riot, sabotage, inability to procure or general shortage of energy, labor, equipment, facilities, materials or supplies in the open market, failure of transportation, strike, lockout, action of labor unions, or any other cause (whether similar or dissimilar to the foregoing) not within the reasonable control of Sponsor. Sponsor's time to perform such obligations or undertaking shall be tolled for the length of the period during which such performance was excused.

29. <u>FURTHER ASSURANCES</u>.  Either party shall execute, acknowledge and deliver to the other party such instruments, and take such other actions, in addition to the instruments and actions specifically provided for herein, as such other party may reasonably request in order to effectuate the provisions of this Agreement or of any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.

30. <u>AGREEMENT NOT CONTINGENT UPON FINANCING</u>. Purchaser fully understands that this Agreement is not be contingent upon Purchaser securing financing of the Purchase Price (or any portion thereof), and Purchaser understands and agrees that his failure to obtain such financing will not relieve him/her of his/her obligations hereunder.  If Purchaser

16

elects to finance the purchase of the Unit and obtains a commitment to lend from a financial institution, neither a subsequent change in the terms of such commitment, the failure of Purchaser to satisfy the conditions of such commitment, the expiration or other termination of such commitment, nor any change in Purchaser's financial status or condition will release or relieve Purchaser of his obligation under this Agreement. If Purchaser finances the purchase of his Unit, neither Sponsor nor the Condominium Board will be obligated to execute or deliver any documents to Purchaser's lender, except as may be required by applicable law.

31.     SEVERABILITY.  If any provision of this Agreement or the Plan is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement or the Plan and the applicability of such provision to other persons or circumstances shall not be affected thereby. Each provision of this Agreement or of the Plan, except as otherwise herein or therein provided shall be valid and enforced to the fullest extent permitted by law.

32.     STRICT COMPLIANCE.  Any failure by either party to insist upon the strict performance by the other of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof and each party, notwithstanding any such failure shall have the right thereafter to insist upon the strict performance by the other party of any and all of the provisions of this Agreement to be performed by such party.

33.     GOVERNING LAW.  The provisions of this Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed wholly in the State of New York, without regard to principles of conflicts of law.

34.     WAIVER OF JURY.  Except as prohibited by law, the parties shall, and they hereby do expressly waive trial by jury in any litigation arising out of or connected with, or relating to, this Agreement or the relationship created hereby or in the Plan. With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.

35.     ENTIRE AGREEMENT.  This Agreement, together with the Plan, supersedes any and all understandings and agreements between the parties and constitutes the entire agreement between them with respect to the subject matter hereof.

36.     CERTAIN REFERENCES.  A reference in this Agreement to any one gender, masculine, feminine or neuter, includes the other two, and the singular includes the plural, and vice versa unless the context otherwise requires. The terms "herein," "hereof or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and not to the particular provision in which the term is used, unless the context otherwise requires. Unless otherwise stated, all references herein to Articles, Sections, subsections, subparagraphs or other provisions are references to Articles, Sections, subsections, subparagraphs or other provisions of this

17

Agreement.

37.     CAPTIONS. The captions in this Agreement are for convenience of reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

38.     SUCCESSORS AND ASSIGNS. The provisions of this Agreement shall bind and inure to the benefit of Purchaser and his heirs, legal representatives, successors and permitted assigns and shall bind and inure to the benefit of Sponsor and its successors and assigns.

39.     CONFIDENTIALITY. Sponsor and Purchaser hereby acknowledge and agree to keep all of the terms and conditions of the Purchase Agreement confidential. Sponsor and Purchaser agree that any information which is required to be disclosed to the parties respective lawyers, architects/engineers, accountants, individuals who "need to know" or governmental agencies shall not be deemed to be a breach by Sponsor or Purchaser of the parties undertaking of confidentiality contained in this Agreement. Any failure by Purchaser to keep the terms and conditions of this Agreement confidential shall be a default by Purchaser, entitling, Sponsor to the remedies set forth in Article 14 of this Agreement.

40.     NO ORAL CHANGES. This Agreement cannot be changed or terminated orally. Any changes or additional provisions must be set forth in a rider attached hereto or in a separate written agreement signed by the parties hereto or by an amendment to the plan.

41.     RESTRICTIONS ON SALE.   Purchaser covenants and agrees to retain ownership in the Unit for a period of one (1) year from the date Purchaser acquired the Unit, except in the case of the death of Purchaser or spouse.  Failure to abide by this requirement shall result in the Purchaser paying to Sponsor a sum equal to 25% of the difference between the new purchase price of the Unit and the Purchase Price set forth in Article 4 of this Purchase Agreement, but in no event less than 10% of the Purchase price set forth in Article 4 of this Purchase Agreement.   The provisions of this Article shall survive delivery of the deed and Closing of Title.

42.     WAIVER OF SOVEREIGN IMMUNITY.  The provisions of this Article 42 apply to any Purchaser that is a foreign government, a resident representative of a foreign government or such other person or entity otherwise entitled to the immunities from suit enjoyed by a foreign government (i.e., diplomatic or sovereign immunity).

        The Purchaser hereby waives any and all immunity from suit or other actions or proceedings and agrees that, should the Sponsor or any of its successors or assigns bring any suit, action or proceeding in New York or any other jurisdiction to enforce any obligation or liability of the Purchaser arising, directly or indirectly, out of or relating to this Agreement, no immunity from such suit, action or proceeding will be claimed by or on behalf of the Purchaser.

N:\Clients\One Hunters Point\ved\FORM - Purchase Agreement - 1 Hunters Pointa.doc

and adjudicated in the state courts of New York or the federal courts sitting in New York, and hereby expressly and irrevocably submits the person of the Purchaser to the jurisdiction of such courts in any suit, action or proceeding arising, directly or indirectly, out of or relating to this Agreement. So far as is permitted by applicable law, this consent to personal jurisdiction shall be self-operative and no further instrument or action shall be necessary in order to confer jurisdiction upon the person of the Purchaser in any such court.

The Purchaser irrevocably waives, to the fullest extent permitted by applicable law, and agrees not to assert, by way of motion, as a defense or otherwise in any suit, action or proceeding arising, directly or indirectly, out of or relating to this Agreement, brought in the state courts in New York or the federal courts sitting in New York: (i) any objection which it may have or may hereafter have to the laying of the venue of any such suit, action or proceeding in any such court; (ii) any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum; or (iii) any claim that it is not personally subject to the jurisdiction of such courts. The Purchaser agrees that final judgment from which the Purchaser has not or may not appeal or further appeal in any such suit, action or proceeding brought in such a court shall be conclusive and binding upon the Purchaser and, may so far as is permitted under the applicable law, be enforced in the courts of any state or any federal court and in any other courts to the jurisdiction of which the Purchaser is subject, by a suit upon such judgment and that the Purchaser will not assert any defense, counterclaim, or set off in any such suit upon such judgment.

The Purchaser agrees to execute, deliver and file all such further instruments as may be necessary under the laws of the State of New York, in order to make effective the consent of the Purchaser to jurisdiction of the state courts of New York and the federal courts sitting in New York and any other provisions of this Article 42.

Nothing in this Article 42 shall affect the right of the Sponsor to bring proceedings against the Purchaser in the courts of any jurisdiction or jurisdictions.

The Purchaser hereby designates Joe Wong, Esq. having its offices, at the date hereof, at 100 Lafayette Street, 7th Floor, New York, NY 10013 as its duly authorized and lawful agent to receive process for and on behalf of the Purchaser in any state or Federal suit, action or proceeding in the State of New York based on, arising out of or connected with this Agreement.

If the Purchaser is a foreign mission, as such term is defined under the Foreign Missions Act, 22 U.S.C. 4305, the Purchaser shall notify the United States Department of State prior to purchasing a Unit and provide a copy of such notice to the Seller. Sponsor shall not be bound under this Agreement unless and until the earlier to occur of: (i) a notification of approval is received from the Department of State; or (ii) sixty (60) days after the Purchaser's notice is received by the Department of State.

19

N:\Clients\One Hunters Point\red\FORM - Purchase Agreement - 1 Hunters Pointa.doc

The provisions of this Article 42 shall survive the Closing of Title or the termination of this Agreement for the purpose of any suit, action, or proceeding arising directly or indirectly, out of or relating to this Agreement.

43.     SPONSOR NOT A FOREIGN PERSON. Seller is not a "foreign person," as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code of 1986, Section 1445, as amended, and the regulations promulgated thereunder. Seller shall deliver to Purchaser, at Closing or at such earlier date as may be required by regulations promulgated pursuant to Section 1445 of the Internal Revenue Code of 1986, an affidavit to such effect.

44.     NO RECORDING OF AGREEMENT.  Neither this Agreement nor any memorandum thereof shall be recorded by Purchaser. Any recordation or attempted recordation by Purchaser of same shall be void and shall be an Event of Default under this Agreement.

45.     FORM 1099-S.  Purchaser's attorney, or such other person as designated by Sponsor, is hereby designated as "the real estate reporting person" with respect to this Agreement and is responsible for the completion and filing of Form 1099-S or such other successor forms as may be prescribed by the Internal Revenue Service and for fulfilling all of the obligations and requirements of Section 6045(e) of the Internal Revenue Code of 1986, as amended (the "Code"). Purchaser and the real estate reporting person shall indemnify and hold harmless Sponsor and its attorneys against any and all penalties, loss and expenses (including, without limitation, attorneys' fees and expenses) resulting from the failure of the real estate reporting person to comply with the Code and the provisions of this Agreement. The provision of this Article 45 shall survive Closing.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

PURCHASER(S):

William Lee

Szuyu Ren

SPONSOR:
BORDEN EAST RIVER REALTY LLC

By: Simone Borden LLC,
    its Managing Member

By: _____
    Name: Joseph Simone
    Title:  Manager

20

## SCHEDULE A - PERMITTED ENCUMBRANCES

1.      Building restrictions and zoning and other regulations, resolutions and ordinances and any amendments thereto now or hereafter adopted.

2.      Any state of facts which an accurate survey or personal inspection of the Property would show, provided such state of facts would not prevent the use of the Unit for dwelling purposes with respect to Residential Units; parking of passenger vehicles or motorcycles with respect to Parking Space Units; and passive recreational purposes with respect to Roof Terrace Units.

3.      The terms, burdens, covenants, restrictions, conditions, easements and rules and regulations, all as set forth in the Declaration, the By-laws (and the Rules and Regulations made thereunder), the Power of Attorney from the Purchaser to the Condominium Board, and the Floor Plans as all of the same may be amended from time to time.

4.      Consents by the Sponsor or any former owner of the Land for the erection of any structure or structures on, under or above any street or streets on which the Property may abut.

5.      Any easement or right of use in favor of any utility company for construction, use, maintenance or repair of utility lines, wires, terminal boxes, mains, pipes, cables, conduits, poles and other equipment and facilities on, under and across the Property.

6.      Rights and licenses, if any, to maintain vaults and chutes under the sidewalks and streets; and revocability of rights and licenses, if any, for vault space and chutes under the sidewalks and streets.

7.      Any easement or right of use required by Sponsor or its designee to obtain a temporary, permanent or amended Certificate of Occupancy for the Building or any part of same.

8.      Encroachments of stoops, areas, cellar steps or doors, trim, copings, retaining walls, bay windows, balconies, sidewalk elevators, fences, fire escapes, cornices, foundations, footings and similar projections, if any, on, over, or under the Property or the streets or sidewalks abutting the Property, and the rights of governmental authorities to require the removal of any such projections and variations.

9.      Leases and service, maintenance, employment, concessionaire and license agreements, if any, of other Units or portions of the Common Elements.

10.     The lien of any unpaid Common Charge, real estate tax, water charge or sewer rent, or vault charge, provided the same are adjusted at the closing of title.

11.     The lien of any unpaid assessment payable in installments (other than assessments levied by the Condominium Board), except that the Sponsor shall pay all such assessments due prior to

the Closing Date (with the then current installment to be apportioned as of the Closing Date) and the Purchaser shall pay all assessments due from and after the Closing Date.

12.    Any declaration or other instrument affecting the Property which the Sponsor deems necessary or appropriate to comply with any law, ordinance, regulation, zoning resolution or requirement of the Department of Buildings, the City Planning Commission, the Board of Standards and Appeals, or any other public authority, applicable to the demolition, construction, alteration, repair or restoration of the Building.

13.    Any encumbrance as to which All New York Title Agency, Inc., as agent for First American Title Insurance Company and Lawyers Title Insurance Corp. (or such other New York Board of Title Underwriters member title insurance company which insures the Purchaser's title to the Unit) would be willing, in a fee policy issued by it to the Purchaser, to insure the Purchaser that such encumbrance (a) will not be collected out of the Unit if it is a lien or (b) will not be enforced against the Unit if it is not a lien.

14.    Any other encumbrance, covenant, easement, agreement, or restriction against the Property other than a mortgage or other lien for the payment of money, which does not prevent the use of the Unit for dwelling purposes with respect to Residential Units; parking of passenger vehicles or motorcycles with respect to Parking Space Units; and passive recreational purposes with respect to Roof Terrace Units.

15.    Any lease covering the Unit(s) made from the Sponsor to the Purchaser.

16.    Any violation against the Property (other than the Unit) which is the obligation of the Condominium Board, or another Unit Owner to correct.

17.    Standard printed exceptions contained in the form of fee title insurance policy then issued by the Title Company.

18.    Any certificate of occupancy for the Building, so long as same permits, or does not prohibit, use of the Unit for its stated purposes.

19.    Covenants, easements, leases, agreements of record, etc., including, but not limited to the following:

    (a)    Easement recorded in Liber 6522, Page 266.

    (b)    Declaration of Zoning Lot Restrictions recorded in CRFN 2005000388660.

        (i)    Waiver of Right to Execute Declaration of Zoning Lot Description recorded in CRFN 2005000388658.

        (ii)    Waiver of Right to Execute Declaration of Zoning Lot Description recorded in CRFN 2005000388659.

N:\Clients\One Hunters Point\ved\FORM - Purchase Agreement - 1 Hunters Pointa.doc

     (c)     Zoning Lot Development Agreement recorded in CRFN 2005000388661.

20.     The lien of any mortgage, lien or other encumbrance granted, created or obtained by the Purchaser.

21.     All loss or damage arising from the imposition of any lien resulting from the restoration of real property taxes upon the premises or the rescission of tax abatements and/or exemptions, including 421-a benefits.

22.     Any loss, claim or damage of any unpaid fee or charge by the City of New York entered in the records of the Department of Finance after the date of Closing.

23.     Service, labor, concessionaire and maintenance agreements contemplated under the Plan.

24.     The Superintendent's Unit mortgage.

25.     Judgments, bankruptcies or other returns against other persons having names the same as or similar to that of Sponsor or any of its principals, provided Sponsor or any such principals, as the case may be, deliver to the Purchaser or the Purchaser's title insurance company an affidavit showing that such judgments, bankruptcies or other returns are not against Sponsor or any such principals, as the case may be.

SCHEDULE B
TO PURCHASE AGREEMENT
INSPECTION STATEMENT

Date: _____ ___, _____


Gentlemen:

1.      On the date hereof the undersigned Purchaser has inspected the Unit(s) set forth below which the undersigned Purchaser is purchasing and have found the Unit(s) to be in good condition, except as otherwise noted below.

_____
_____
_____

2.      The undersigned acknowledges that to prevent pilferage, certain items such as medicine cabinet doors, shower heads, toilet seats, kitchen cabinets, vanity knobs and mechanical chimes will be installed just prior to the date the undersigned moves into the Building. The undersigned Purchaser agrees to sign-off each item requiring adjustment, or repairs, if any, as they are completed.

3.      Purchaser understands that the full balance of the Purchase Price of the Unit must be paid at Closing under the Purchase Agreement, without provision for escrow, notwithstanding Sponsor's obligation to complete or correct the items noted herein.

4.      Purchaser understands and agrees that Sponsor shall not be obligated to make any repairs, adjustments or corrections to the Unit or any portion thereof or its fixtures, appliances, equipment, etc., contained therein, from and after the date of delivery of possession of the Unit to Purchaser, except as to those items (if any) expressly excepted herein (and Sponsor's obligation regarding any such excepted items shall cease upon the completion of the repair, adjustment or correction of same).  Nothing contained herein shall be construed to excuse Sponsor from its obligations to correct defects in construction

N:\Clients\One Hunters Point\red\FORM - Purchase Agreement - 1 Hunters Pointa.doc

to the extent required and subject to the conditions set forth in the section entitled "Rights and Obligations of Sponsor" of the Offering Plan.

Residential Unit Number D6
Parking Space Unit Number N/A
Roof Terrace Unit Number N/A
One Hunters Point Condominium
5-49 Borden Avenue
Long Island City, New York

PURCHASER(S):

_____
William Lee

_____
Szuyu Pan

SPONSOR:
BORDER EAST RIVER REALTY LLC

By:   Simone Borden LLC, its Managing Member

BY: _____
Name: Joseph Simone
Title:  Manager